Peck, J.,
dissenting:
In this case, I think, the rules and regulations established by the appropriate Department in relation to distillers and the Tice meter were purposely so expressed as to lead the distillers to suppose that they were to be, and should be, protected by the United States in the expenditure of their money for- the meters, against all defects in the meters, and against any imposition of the constructor, or of the officers acting for the United States. The business of distilling was prohibited, the capital employed in that business was lost and useless to the owner, unless he should first purchase a Tice meter. He was in fact under “ duress” of the strongest character which did not extend to life or limb to deposit his money for the payment of the meter, and the Government promised that if he should do so they would undertake to protect him, and take care that the instrument which it — not he — demanded should be of benefit and useful to both; and until such instrument, to be previously examined and inspected by the defendants, was furnished and tested, they agreed to keep his money for him, or, in other words, not to *406 pay it over. The meter could not be attached to the distillery except through or by the agents of the United States. The claimant could not help or protect himself in the' least. He was not permitted to participate in any way in the purchase of the meter, or to. judge of its quality, or fitness, or adaptation to the use for which it was designed; in plain language, it was a command to him which he was powerless to resist. It was a modified change from the language of the highwayman, “Your money or your life f in this case, it was your money for the meter, or a waste of your capital and an abandonment of your business and its pursuits. If the business was against public policy or good morals it should have been forbidden, but not tolerated or perhaps encouraged, provided it should be prosecuted under the forms of law and the protection and shield of a Tice meter.
It is plain that the meters were useless as detectors of fraud, and for this reason they were everywhere abandoned and condemned'. In this particular case only one of the meters, which proved to be defective, was ever applied to the distilleries of the claimants. The other meter was never even delivered in the manner required by or within the direction and meaning of the rules and regulations of the Department.
The defendants undertook and promised that they would, through the instrumentality of their officers, hold the money of the claimants for their security and benefit until certain obligations which the defendants assumed and declared were for their benefit, as well as for the benefit of the claimants, should be complied with by a third party; and, without this, that the money of the claimants should be kept for them. If this was not to be so, what other meaning can be connected with the transaction? If the interests of the Government were not such as to warrant the employment of its officers in the character of stake-holders, why did it interfere with the business of a citizen and not permit him to bargain for himself, at the peril of having his business stopped, compelling him to pay his money without choice or discretion of his own? Why not compel him to purchase all his machinery and material for carrying on his distillery 'of some particular individual ? This would have neen another way of discovering frauds quite as effectual at least as a Tice meter.
To say that the condemned meters were left at the disposal *407 of the claimants, who might sell them and so get an equivalent for their money, is to feed them with stones instead of bread, is to offer them a taunt rather than a reason, tendering a sarcasm in lieu of dollars, compelling them to take as a compensation for the protection offered them useless and condemned instruments which are without value save what they may bring as wasted and useless material.
All the transactions between the Government and its citizens should have not only the appearance of fairness, but should be marked by the reality of it; all semblance of'speculation or cunning should be avoided and condemned. An attempt to shirk responsibility, if it fairly attaches to the Government, is not to be commended; honesty, as a policy merely, is more important in the conduct of public than of private affairs, and should always be regarded, and is best enforced by the example of shining marks. The citizen should not be taught by the highest power in the land, when he deals with it, that he is to encounter artifice and deception, and is to overcome these, if at all, by a resort to the same degrading expedients. An unfair government begets unfairness in the citizen, an immoral contagion is spread, until both, suffering from the taint, travel on the downward road, forgetting that “corruption wins not more than honesty,” but ruins all. Dollars, when placed in the scale against integrity and fair dealing, are certain to weaken the confidence of the people in the good faith of their Government, and they will be willing to see it destroyed. An offence against good morals can never be outweighed by pecuniary gains.
I say, without feeling any compunction for the utterance, that I do not discover in this matter between the claimants and defendants anything in the likeness of paternal or benevolent or even j ust treatment of the citizen by the Government, since it refuses to return the money of these claimants which they were compelled to trust to its keeping, which it has misappropriated, and which is now lost to them.